# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 2, 2003

## STATE OF TENNESSEE v. BARRY GRAHAM

### Direct Appeal from the Circuit Court for Rutherford County
### No. F-52071    James K. Clayton, Jr., Judge

---

### No. M2003-00949-CCA-R3-CD - Filed January 13, 2004

---

The defendant, Barry Graham, was convicted by a Rutherford County Circuit Court jury of aggravated burglary, a Class C felony, and theft of property under $500, a Class A misdemeanor. He was sentenced by the trial court as a Range III, persistent offender to concurrent sentences of thirteen years for the aggravated burglary conviction, and eleven months, twenty-nine days for the theft conviction, to be served consecutively to a sentence in a previous case. The sole issue the defendant raises on appeal is whether the circumstantial evidence at trial was sufficient to establish his guilt of the offenses. We conclude the evidence was sufficient for a rational jury to find him guilty of aggravated burglary and theft under $500 beyond a reasonable doubt. Accordingly, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Gerald L. Melton, District Public Defender, and Russell N. Perkins, Assistant District Public Defender, for the appellant, Barry Graham.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Paul A. Holcombe, III, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On Monday, September 3, 2001, Sandra Stahr, the victim in this case, returned home from a Labor Day camping trip with her family to find her back door kicked in and two items missing: $250 in cash from her son's wallet and a caller ID box from her bedroom. The defendant was dating the victim's cousin, Terri Bull, at the time, and on the previous Thursday had visited Bull as she

babysat the victim's children in the home. While there, the defendant had helped the victim's son count his money and place it in the wallet. A separate caller ID device, which was built into a telephone in the livingroom, reflected that a call had been placed to the victim's home from the defendant's residence on Sunday evening, September 2, while the family was away for the holiday. The defendant was subsequently arrested and charged with aggravated burglary and theft of property under $500.

Rutherford County Sheriff's Deputy David Crim testified at the defendant's September 25-26, 2002, trial that he was dispatched to the victim's residence on Monday, September 3, 2001, in response to a report of an aggravated burglary. When he arrived, he found that several panels of glass around the handle in a French door at the back of the residence had been broken out and determined that the lock had been turned from the inside. Deputy Crim testified there was broken glass around the door, as well as in some large, dirty footprints leading toward the living room. At that time, $250 in cash and a telephone caller ID box were the only items he could determine that had been taken. While he was in the home, the victim directed his attention to a second caller ID device in the living room, which was part of a telephone rather than a separate unit, where he observed that a telephone call had been placed to the home from the residence of Jennye Graham on Sunday night. Although he could not remember the exact time the call had been made, Deputy Crim recalled that it was sometime between 10:00 and 11:00 p.m.

Tammy Stahr, the victim's adult daughter, testified she checked her mother's home between 5:00 and 7:00 p.m. on Saturday of that Labor Day weekend and found nothing amiss at that time. On cross-examination, she testified that she had, in the past, been present in the home when the defendant had telephoned looking for Bull.

The victim testified she had three children: Tammy, Stephanie, and Donnie. Tammy and Stephanie were present for the defendant's trial, but Donnie, who was seventeen at the time of the burglary, had been diagnosed at the age of four with Duchenne muscular dystrophy and had died on Memorial Day, 2002. At the time of the burglary and theft, Donnie had been saving his Christmas and birthday money, as well as a portion of his allowance, to buy a stereo for his wheelchair and had accumulated $250 in cash which he typically kept in a wallet in the nightstand beside his bed.

Stahr testified she threw darts with her dart league after work on Thursday evening before Labor Day weekend, while her first cousin and best friend, Terri Bull, stayed at her house to watch Donnie and Stephanie. She said she did not learn until later that the defendant, who was dating Bull at the time, visited Bull in the home that evening. Bull was already asleep when Stahr arrived home at about 10:00 p.m., and the defendant was not there. Stahr testified she left a note for Bull, awakened her children, and departed for the camping trip that night, although she had originally planned to wait until the next morning. She said Bull spent Thursday night in her home.

Stahr testified she returned from the camping trip at about noon on Monday to find her back door open and the glass in the door broken out. Because nothing inside the house appeared out of order, she initially attributed the act to teenage vandals. However, as she was in the process of

cleaning up the broken glass, Donnie came wheeling from his bedroom with his wallet open, saying, "Mama, my money's gone." When she asked if he was sure his money had been in that particular wallet, he replied, "[Y]es, because Thursday [the defendant] helped me count it and put it in order." Stahr then noticed that the caller ID box was missing from the desk in her bedroom. At first, the money and caller ID box were the only items she knew to be missing. At a later date, however, she realized that some pieces of jewelry she had left on the desk in her bedroom, near the caller ID box, were missing as well. The four televisions, two boom boxes, microwave, and various video games that were in the house had not been taken, and the jewelry in her jewelry box on her dresser in her bedroom had not been disturbed.

Deputy Crim asked Stahr when he arrived if she had another caller ID box in the house, and she showed him one that was built into the handset of a telephone that she had hung up to recharge, which would not have been visible unless one used the phone. When she scrolled through the numbers, she saw that a call had come in at about 10:30 Sunday night from the residence of Jennye Graham, the defendant's mother, whose name she recognized because Bull had called her from that residence in the past.

Stahr testified that the defendant had previously been in her home, including the bedroom where the caller ID box was located. She explained that Bull had stayed in the bedroom while recovering from a hysterectomy, and the defendant had visited her during that time. She stated that she had had some bottles of Michelob Light beer in her refrigerator when she left for her camping weekend. On cross-examination, she acknowledged it was not unusual for Bull and the defendant to talk together on the telephone.

Terri Lynn Bull testified she and the defendant had dated off and on for almost four years, and were dating at the time of the burglary. They were at present "not really dating" but still saw each other regularly. The defendant had visited her as she was watching the victim's children on the Thursday afternoon before Labor Day, and had stayed approximately three or four hours but had left by the time the victim returned to the house. Bull testified she had known about the victim's planned camping weekend, and believed she had communicated that knowledge to the defendant. She said she and her grandson had spent the night at the victim's house and left at approximately 10:00 the next morning. Around midday on Saturday, September 1, she went to spend the weekend with her brother in Kingston Springs. Because the defendant was having trouble with his car battery, she gave him the only spare set of keys to her second vehicle, a 1989 Ford Taurus, in the event he needed to use her car while she was gone. She kept the other set of keys with her.

Bull testified she returned home at about 7:00 Sunday evening and had two or three telephone conversations with the defendant before she went to bed at 10:00 p.m. The defendant knew she was at her home, rather than the victim's, and she never indicated to him that she would be going to the victim's house that evening. When she left for work at 5:30 the next morning, she noticed that her Ford Taurus had been backed into its parking space crooked, which was different from the way she had left it Saturday. The defendant returned her keys to her at work at 10:00 a.m. Monday, even though she had not asked him to do so. Bull testified she returned home around noon after working

a half-day. When the victim informed her of the burglary, she went out to check her Taurus and found, in addition to the crooked parking, the steering wheel tilted down, shattered glass on the driver's side floorboard, a Michelob beer bottle lying on the ground beside the driver's door, and a matching Michelob bottle cap on the rear floorboard behind the driver's seat. She said the vehicle's ignition had not been broken and there were no signs of forced entry.

Bull testified she had never drunk Michelob beer in the car, and, to her knowledge, neither had the defendant. He had, however, drunk other kinds of beer in her car. She said the defendant had parked the vehicle crooked and left the steering wheel down on previous occasions when he used her car. She acknowledged on cross-examination, however, that she had no direct knowledge the defendant had used her vehicle that weekend, or whether it was already in the position in which she found it Monday when she returned home Sunday night.

Detective David Hailey of the Rutherford County Sheriff's Department testified he went to the victim's residence a day or two after the burglary had been reported and spoke with both the victim and Bull. While he was there, the victim showed him her telephone's caller ID, on which he saw that a call had been received at 10:47 p.m. Sunday, September 2, from the residence of Jennye Graham. After learning about the shattered glass on the floor mat of Bull's car, Detective Hailey sent the floor mat and samples of the glass from the victim's residence to the Tennessee Bureau of Investigation ("TBI") Crime Laboratory in Nashville for analysis, as well as a pair of size 7½ work boots he collected from the defendant on the fourth day following the burglary. The boots were the only shoes he collected from the defendant and appeared to have been cleaned.

Detective Hailey testified he found a Michelob Light bottle cap on the rear floorboard of Bull's car, which matched a Michelob Light bottle Bull had recovered from the ground beside the car. His investigation revealed that the beer bottle Bull found had the same "born on" date and lot number as a bottle of Michelob Light he took from the victim's refrigerator for comparison, which meant, essentially, that the two bottles were produced at the same plant in Cartersville, Georgia, between 7:00 and 7:15 a.m. on August 1. He said he measured the distance from Bull's residence to the defendant's mother's residence by car and found it to be eight-tenths of a mile. He estimated, however, that it was only four or five-tenths of a mile if one followed a direct path by foot.

On cross-examination, Detective Hailey testified the footprints from the crime scene had not been preserved and, thus, had not been compared to the defendant's boots. The defendant was wearing the boots when Detective Hailey arrested him on September 6, one day after the defendant, at Detective Hailey's request, had voluntarily come into the office to talk to him. Detective Hailey acknowledged he made no attempt to obtain a search warrant for the defendant's other pairs of shoes, or to lift any fingerprints from the crime scene. Further, although some "overlays and smudges" had been lifted from the beer bottle found beside Bull's car, they were not sent to the crime lab for analysis. Finally, he testified he had learned from the beer distributor that six hundred cases of beer could have rolled off the same assembly line at the Cartersville plant during the fifteen-minute time period in which the beer in the victim's refrigerator and the beer found beside Bull's car had been produced.

Special Agent Randall Nelson of the TBI Crime Laboratory in Nashville, who was accepted as an expert in the field of microanalysis, testified the Rutherford County Sheriff's Department submitted the following items for analysis: a sample of glass from the victim's floor, a floor mat from which Agent Nelson recovered several large fragments of glass, and a pair of work boots. Agent Nelson testified he compared the glass from the victim's floor to the glass he recovered from the floor mat in terms of their respective method of manufacture, thickness, color, density, and refractive index. Because none of the tests he performed showed any inconsistencies between the samples, he concluded that the glass samples from the floor mat "were consistent with the samples that were taken from the victim's residence." He added, however, that the glass samples from the floor mat "could also be consistent with another source of glass with exactly those same optical and physical properties." Thus, he said, "there is that possibility that there is another source of glass out there with those identical properties." He did not find any glass on the pair of work boots submitted for analysis.

Following the trial court's overruling of the defendant's motion for judgment of acquittal, the defendant's mother, Jennye Graham, testified that she remembered the defendant, who lived with her, having been home that entire Labor Day weekend. She did not specifically remember if she went to church that Sunday but said it was possible she did because she regularly attended church. She thought she went to bed Sunday night at about 11:00 p.m., which was her usual bedtime. The defendant was watching television in the living room when she went to bed and was still in bed when she arose the next morning at 6:00 or 6:30. However, she acknowledged she did not know the defendant's whereabouts or activities from the time she went to bed until she arose the next day.

Graham testified on cross-examination that she watched televison in her bedroom before she went to bed. She said she did not know the victim's telephone number and did not call her at 10:45 p.m. As far as she knew, the defendant was the only individual, besides herself, who was in the house that evening. On redirect, she testified that her daughter lived in an apartment near her residence, but she did not remember her having been in the house that night. She acknowledged on recross-examination that her daughter had a separate telephone line in her apartment.

Jennifer Graham, the defendant's sister, testified she lived in a small apartment next door to her mother's house and had been home all day on the Sunday of the previous year's Labor Day weekend. She said her apartment's door faced the driveway and backyard of her mother's house, and she observed the defendant doing yard work at the house all day. She last saw the defendant at 7:00 or 8:00 p.m., when he went into her mother's house. She went to bed at about 1:30 a.m. and did not hear anyone coming or going from her mother's house that night.

The defendant elected not to testify and rested his case without presenting any further proof. Thereafter, the jury found him guilty of the indicted offenses, and the trial court sentenced him as a Range III, persistent offender to thirteen years for the aggravated burglary conviction and eleven months, twenty-nine days for the theft conviction, to be served consecutively to a sentence for an offense for which the defendant was on parole at the time he committed the instant offenses.

**ANALYSIS**

The sole issue the defendant raises on appeal is whether the circumstantial evidence in this case was sufficient to support his convictions. He asserts that no evidence was produced at trial that directly connected him with the burglary or which placed him in possession of the Ford Taurus at anytime that weekend and points out that his boots were never linked to the footprints found at the crime scene. The defendant contends the jury was asked to decide his guilt based solely on the telephone call made from his residence to the victim's home, and such evidence was not sufficient to exclude every other reasonable hypothesis other than his guilt of the offenses.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The same standard of review is applicable to convictions based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998). However, if a conviction is based entirely on circumstantial evidence, the facts must be "'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002) (quoting State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993)). The weight of circumstantial evidence is for the jury to determine. State v. Coury, 697 S.W.2d 373, 377 (Tenn. Crim. App. 1985). Further, whether all other reasonable theories have been excluded by the evidence is primarily a question of fact for the jury. Pruitt v. State, 460 S.W.2d 385, 391 (Tenn. Crim. App. 1970).

Aggravated burglary is defined as "burglary of a habitation." Tenn. Code Ann. § 39-14-403(a). Burglary is defined as:

> A person commits burglary who, without the effective consent
> of the property owner:

> (1) Enters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault;
>
> (2) Remains concealed, with the intent to commit a felony, theft or assault, in a building;
>
> (3) Enters a building and commits or attempts to commit a felony, theft or assault; or
>
> (4) Enters any freight or passenger car, automobile, truck, trailer, boat, airplane or other motor vehicle with intent to commit a felony, theft or assault or commits or attempts to commit a felony, theft or assault.

Tenn. Code Ann. § 39-14-402(a). Theft of property is defined as: "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103.

We conclude that the evidence at trial was sufficient to support the defendant's convictions for aggravated burglary and theft under $500. The State's theory was that the defendant, knowing that the victim's family would be away for the weekend and where the victim's son kept his cash, first telephoned the victim's house late Sunday night to make sure the family was still away and then walked the short distance from his mother's house to Bull's car. The defendant then drove to the victim's house, broke in, and took the cash, the only caller ID device of which he had any knowledge, and the jewelry that was lying beside the caller ID box. On his way out, he grabbed a bottle of beer from the refrigerator, tossing the empty bottle on the ground when he returned Bull's car to the parking lot before walking the short distance back home.

Viewed in the light most favorable to the State, the evidence at trial supports the State's theory of the case. The evidence established that the defendant was present in the victim's home on the Thursday afternoon before the Labor Day weekend, and was aware that the family would be leaving for a weekend camping trip. The defendant helped the victim's son count and put away his money, and thus knew that there was a relatively large amount of cash in the home and where it was kept. The defendant also knew about the caller ID device on the victim's desk, as he had visited Bull in that bedroom in the past.

The only items missing from the home were the caller ID box from the victim's bedroom, the cash from the wallet in Donnie's bedroom, and a few pieces of jewelry the victim had lying on the desk beside the caller ID box. The home had not been ransacked, and no other items had been taken, despite the fact that there were a number of other valuable items in the home. Another caller ID device, which was built into the handset of a telephone and therefore not readily visible, reflected that a call had been placed to the victim's home from the defendant's residence on Sunday night at

10:47 p.m., at a time when the defendant knew that his girlfriend, Terri Bull, would not be present. Neither the defendant's mother nor his sister knew the victim's telephone number, and each testified they had not made the call.

Shattered glass found at the crime scene was consistent with pieces of shattered glass that Bull found on the floor mat of her automobile after she returned from a weekend trip, and when she had left her only spare set of keys with the defendant. There were no signs of forced entry into the vehicle. The vehicle had been parked crooked in the parking space and the steering wheel had been tilted down, both of which were things the defendant had done in the past. Bull knew the defendant to be a beer drinker. A Michelob Light beer bottle was lying on the ground beside the vehicle's driver's door when she inspected the vehicle on Monday afternoon, and a matching bottle cap was on the floorboard behind the driver's seat. Finally, the "born on" date and lot number of the bottle found beside Bull's vehicle indicated it had come off the same assembly line as the bottles in the victim's refrigerator, during the same fifteen-minute interval of production. None of these facts, alone, would be sufficient to establish the defendant's guilt of the offenses. Taken together, however, they were sufficient for a rational jury to find him guilty of aggravated burglary and theft under $500 beyond a reasonable doubt.

## CONCLUSION

We conclude that the evidence in this case was sufficient to support the defendant's convictions. Accordingly, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE